IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DEBORAH B.,                          )
                                     )
                  Plaintiff,         )
                                     )
         v.                          )          1:25CV32
                                     )
FRANK BISIGNANO,[1]                  )
Commissioner of Social Security,     )
                                     )
                  Defendant.         )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Deborah B. ("Plaintiff") brought this action pursuant to Section 205(g) of the

Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a

final decision of the Commissioner of Social Security denying her claim for Disability

Insurance Benefits ("DIB") under Title II of the Act.  The parties have filed cross-motions

for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on January 31, 2014, alleging a

disability onset date of December 30, 2013.  (Tr. at 383.)[2]  Her application was denied initially

---

[1] The United States Senate confirmed Frank Bisignano as the Commissioner of Social Security on May 6, 2025, and he took the oath of office on May 7, 2025.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the Defendant in this suit.  Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #3].

(Tr. at 195) and upon reconsideration (Tr. at 202). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 210.) On March 21, 2017, Plaintiff, along with her attorney, attended the subsequent telephone hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 112-24.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 152.) However, on July 16, 2018, the Appeals Council vacated the ALJ's July 5, 2017 decision and remanded the case for a new hearing. (Tr. at 168.)

Plaintiff's second administrative hearing was held on November 21, 2018. (Tr. at 79-111.) This hearing again resulted in a finding that Plaintiff was not disabled under the Act (Tr. at 171), and Plaintiff again filed a request for review the Appeals Council (Tr. at 329.) In an Order dated September 16, 2019, the Appeals Council determined that Plaintiff's second, March 15, 2019 hearing decision, like the 2017 decision, was not supported by substantial evidence. (Tr. at 190-92.) Accordingly, the Council vacated the decision and once again remanded the case for a new hearing. (Tr. at 190.)

Plaintiff's third administrative hearing took place on May 21, 2020 (Tr. at 42-75) and again resulted in an unfavorable decision (Tr. at 15). On November 19, 2020, the Appeals Counsel denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-6).

Plaintiff filed a civil action in this Court on January 18, 2021. (See Civil Docket Case # 1:21CV49.) After reviewing Plaintiff's arguments, the Acting Commissioner filed a Motion to Remand the case to the agency. (See Tr. at 1951.) On September 29, 2022, the Court issued an Order and Judgment reversing the third, unfavorable administrative decision and

2

remanding the case to the agency for further proceedings. (Tr. at 1959-61.) In light of the Court's Order, the Appeals Council vacated the hearing decision and remanded the case for yet another hearing. (Tr. at 1945.)

Plaintiff attended her fourth disability hearing on October 19, 2023. As at her previous hearings, Plaintiff was represented by an attorney, and both Plaintiff and an impartial vocational expert testified. (Tr. at 1842-1890.) Following the hearing, the ALJ once again concluded that Plaintiff was not disabled under the Act. (Tr. at 1814.) Although Plaintiff filed exceptions to the ALJ's unfavorable decision with the Appeals Council (Tr. at 2129), the Council ultimately declined to assume jurisdiction (Tr. at 1799), and Plaintiff filed the instant civil action on January 14, 2025.

## II.    LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

3

scintilla of evidence but may be somewhat less than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." <u>Hancock</u>, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" <u>Id.</u> (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for

4

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

_____

determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations

5

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.   DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in substantial gainful activity from her alleged onset date, December 30, 2013, through her date last insured for purposes of DIB, March 31, 2017. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 1819.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> [D]egenerative disc disease of the lumbar and thoracic spine; osteoarthritis; peripheral neuropathy; migraine headaches, and obesity[.]

(Tr. at 1819.) The ALJ found at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 1822-23.) The ALJ

---

(mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

therefore assessed Plaintiff's RFC and determined that she could perform light work with the following, additional limitations:

> [Plaintiff] could sit six hours of an eight-hour workday, with the need to alternate to standing for five to 10 minutes after every two hours of sitting. She could stand and/or walk for six hours in an eight-hour workday, with the need to alternate to sitting at the workstation for five to ten minutes after every hour of standing/walking. She frequently could reach overhead with her right upper extremity. She frequently could climb stairs and ramps, but never climb ladders, ropes, or scaffolds. She frequently could balance and stoop, and occasionally kneel, crouch, or crawl. She never could be exposed to unprotected heights or vibration, and could have occasional exposure to moving mechanical parts.

(Tr. at 1823.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that, during the time period at issue, Plaintiff remained capable of performing her past relevant work as a small products assembler. (Tr. at 1828.) In the alterative, the ALJ further found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 1828-29.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act at any time between December 30, 2013 and March 31, 2017. (Tr. at 1829-30.)

Plaintiff now raises four challenges to the ALJ's decision. Specifically, she contends that the ALJ erred by (1) finding Plaintiff "capable of performing past relevant work that was not substantial gainful activity," (2) "failing to apply all of the factors required by 20 C.F.R. 404.1527(c) to evaluate the opinion of a treating physician," (3) improperly discounting Plaintiff's reports of disabling migraine symptoms, and (4) "failing to establish that the ALJ obtained sworn testimony from either witness" at Plaintiff's hearing. (Pl.'s Br. [Doc. #8] at 3-

4.)  After a thorough review of the record, the Court finds that none of these contentions merit remand.

A.  Past relevant work

Plaintiff first argues that, at step four of the sequential analysis, the ALJ erred in finding Plaintiff capable of past relevant work that was not substantial gainful activity.  Under the regulations, past work experience is only considered "relevant" when it is (1) work that done within the past 15 years, (2) was substantial gainful activity, and (3) lasted long enough for [the claimant] to learn to do it.  20 C.F.R. § 404.1560(b)(1).  The 15-year requirement encompasses the earlier of (1) the 15 years immediately prior to the disability hearing or (2) the 15 years prior to the date the claimant last met the disability insured status requirements.  Social Security Ruling ("SSR") 82-62, Titles II and XVI: A Disability Claimant's Capacity to do Past Relevant Work, in General, 1982 WL 31389, at *2 (1982).  In the present case, Plaintiff testified that she performed the job of a small products assembler for six months beginning in 2010, which was within the relevant 15-year period.  (Tr. at 1828.)  When evaluating the second requirement, whether Plaintiff's work activity qualifies as substantial gainful activity ("SGA"), the regulations provide that the claimant's earnings represent the "primary consideration."  20 C.F.R. § 404.1574(a)(1).  The agency's earnings guidelines set out the minimum amount a claimant must have earned in a given calendar year in order to create a presumption that she performed substantial gainful activity during that year.  See 20 C.F.R. § 404.1574(b)(2); see also Soc. Sec. Admin. Program Operations Manual Syst. ("POMS") § DI 10501.015B (providing table of monthly SGA earnings thresholds for calendar years 1978 through 2025).  Plaintiff argues that her work as a small products assembler fails to meet the requirements of

8

past relevant work at this step, because her earnings in 2010 and 2011 did not meet the earnings guidelines. (Pl. Br. at 10.)

Even if Plaintiff is correct, her argument fails to provide a basis for remand. In addition to finding Plaintiff capable of her past relevant work at step four, the ALJ made an alternative finding at step five of the sequential analysis. Specifically, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 1828-29.) Plaintiff does not challenge any of the jobs identified at this later step. Accordingly, any error at step four proves harmless.

B. Treating physician's opinion

Plaintiff next contends that the ALJ failed to properly evaluate the medical opinion evidence submitted by Plaintiff's treating physician, Dr. Douglas E. Shultz. For Title II claims, such as this one, that are filed, or considered filed, before March 24, 2017, ALJs must evaluate the medical opinion evidence in accordance with 20 C.F.R. § 404.1527(c). Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. While the regulations mandate that the ALJ evaluate each medical opinion presented to her, generally "more weight is given 'to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.'" Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)). In addition, under what is commonly referred to as the "treating physician

9

rule," the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to:

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with other substantial evidence in [the] case record," it is not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4; Brown, 873 F.3d at 256; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[5] If it is not given controlling weight, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

The Fourth Circuit confirmed the application of the treating physician rule in Arakas v. Commissioner, 983 F.3d 83 (4th Cir. 2020) and Dowling v. Commissioner, 986 F.3d 377 (4th Cir. 2021). In Arakas, the Fourth Circuit "emphasized that the treating physician rule is

---

[5] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

a robust one: '[T]he opinion of a claimant's treating physician [must] be given great weight and may be disregarded only if there is persuasive contradictory evidence.'" Arakas, 983 F.3d at 107 (quoting Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987)). Thus, "the opinion *must* be given controlling weight *unless* it is based on medically unacceptable clinical or laboratory diagnostic techniques or is *contradicted* by the other substantial evidence in the record." Id. (emphasis in original). Similarly, in Dowling, the Fourth Circuit emphasized that even if a "medical opinion was not entitled to controlling weight, it does not follow that the ALJ had free reign to attach whatever weight to that opinion that he deemed fit. The ALJ was required to consider each of the six 20 C.F.R. § 404.1527(c) factors before casting [the treating physician] opinion aside." Dowling, 986 F.3d at 385. "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." Id.

In this case, Plaintiff presented a letter from Dr. Schultz dated November 6, 2018. (Tr. at 1695.) Dr. Schultz, an internal medicine specialist, explained that Plaintiff had been "a patient in [his] practice since later 2015" and was generally seen there twice a month for her myriad medical issues. (Tr. at 1695.) Dr. Schultz identified Plaintiff's impairments as including, but "not limited to diverticulitis, degenerative disk disease of the lumbar spine, osteoarthritis, venous insufficiency of the lower extremities with pins and needles and pain sensations, painful varicose veins, urinary tract infections, tachycardia, iron deficiency anemia, [and] chronic fatigue." (Tr. at 1695.) Crucially, in terms of Plaintiff's functional limitations, Dr. Schultz opined, in full, as follows:

11

It is my opinion, based on the medical history and face to face visits with [Plaintiff,] that she is unable to work at any type of meaningful employment. She most certainly cannot sit for any length of time, nor with her back and arthritis issues, could she stand for any period of time. With all of her medical problems combined, she is not able to work in the foreseeable future.

(Tr. at 1695.)

The ALJ gave Dr. Schultz's opinion no weight. In doing so, he explained that

the opinion of complete debilitation—the inability to sit or stand for any period of time—finds no support whatsoever in the record. Rather, [Plaintiff] consistently reported independent activities of daily living, including caring full time for her elderly mother. This would not be possible if [Plaintiff] was essentially bedridden, as set forth by Dr. Schultz. This level of debilitation similarly is inconsistent with observations showing [Plaintiff] to be healthy appearing and in no acute distress, and ambulation with a normal gait, with negative straight leg raise, and normal strength, range of motion, sensation, coordination, and reflexes.

(Tr. at 1827) (internal citations omitted).

Plaintiff now contends that the ALJ failed to "meaningfully consider each of the factors" provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6) when discounting Dr. Schultz's opinion. Dowling, 986 F.3d at 385. The Court disagrees. First, as set out in 20 C.F.R. § 404.1527(d), opinions on some issues are not considered medical opinions, "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." For example, "[a] statement by a medical source that [a claimant is] 'disabled' or 'unable to work' does not mean that [the agency] will determine [that the claimant] is disabled." 20 C.F.R. § 404.1527(d)(1). In fact, no "special significance" is assigned to such opinions. 20 C.F.R. § 404.1527(d)(3). Here, the ALJ noted Dr. Shultz's statement that Plaintiff "is unable to work at any type of meaningful employment." These are opinions on an issue

12

reserved to the Commissioner, for which the treating physician deference would not apply.
As the ALJ observed,

> [T]here is no indication that Dr. Schultz has the vocational training and qualifications to opine as to the availability of work. The vocational expert does have such qualifications, and testified [Plaintiff] is able to perform work as set out.

(Tr. at 1827.)

Moreover, as noted by the ALJ, the opinions posited by Dr. Schultz indicate "complete debilitation." Specifically, as discussed by the ALJ, Dr. Schultz opined that Plaintiff "'cannot sit for any length of time' and is unable to 'stand for any period of time.'" (Tr. at 1827.) The ALJ concluded that these opinions were "patently absurd." (Tr. At 1827.) The ALJ specifically acknowledged that Dr. Schultz was Plaintiff's "own medical source" (Tr. at 1827), and repeatedly cited to Dr. Schultz's treatment records over time,[6] clearly acknowledging their treatment relationship. Dr. Schultz himself clearly noted that he had been seeing Plaintiff

---

[6] For example, the ALJ specifically cited and discussed Dr. Shultz's examinations of Plaintiff in 2016 and 2017, noting that "examination findings were relatively benign." (Tr. at 1825, citing Tr. at 1508, 1534; see also Tr. at 1824, citing Tr. at 1506; Tr. at 1825, citing Tr. at 1507; Tr. at 1825, citing Tr. at 1510.) The ALJ also cited to Dr. Shultz's treatment notes reflecting that Plaintiff "referred to her migraines as stable, and she often denied headaches." (Tr. at 1826, citing Tr. at 1215, 1464, 1516.) The ALJ also cited to Dr. Shultz's treatment notes reflecting that Plaintiff "repeatedly told providers that she was her elderly mother's primary full-time caregiver." (Tr. at 1821, citing Tr. at 14F, 30F; Tr. at 1865, citing Tr. at 1457-59.) The ALJ also generally cited to Dr. Shultz's treatment notes reflecting "conservative treatment history, showing good control of her conditions with medication, only mild imaging findings, physical examinations showing normal strength and range of motion with no significant neurological deficits, and extensive reported activities of daily living." (Tr. at 1827, citing Tr. at 14F.) Similarly, the ALJ cited Dr. Schultz's treatment notes reflecting that Plaintiff was "alert and oriented, pleasant and cooperative, and appropriately groomed and dressed, with normal mood and affect, intact memory and concentration, and no apparent cognitive deficits; along with independent activities of daily living, including cooking, shopping, housework, self-care, and caring for her mother." (Tr. at 1820, 1821-22, citing Tr. at 26F, 30F.) The ALJ also cited to Dr. Schultz's treatment notes reflecting that "observations generally showed independent ambulation with a normal gait, and good overall strength and range of motion, with no mention of decreased grip strength or manipulative skills" and "no indication that a provider recommended the use of an assistive device." (Tr. at 1822, citing Tr. at 14F; Tr. at 1827, citing Tr. at 14F.) Thus, the ALJ's discussion fully acknowledges the length, nature, and extent of Plaintiff's treatment with Dr. Shultz.

since 2015 and saw her at least once a month, usually twice a month. (Tr. at 1695.) The ALJ did not question the length and nature of the treatment relationship or the frequency of examination. Notably, as set out above, the ALJ determined that Dr. Schultz's "opinion of complete debilitation—the inability to sit or stand for any period of time—finds no support whatsoever in the record." (Tr. at 1827.) The ALJ then went on to explain how drastically Plaintiff's clinical findings, activities of daily living, and other medical opinion evidence contradicted Dr. Schultz's statements. (Tr. at 1827.) As explained by the ALJ:

> [Plaintiff] consistently reported independent activities of daily living, including caring full time for her elderly mother. This would not be possible if [Plaintiff] was essentially bedridden, as set forth by Dr. Schultz. This level of debilitation similarly is inconsistent with observations showing [Plaintiff] to be healthy appearing and in no acute distress, and ambulating with a normal gait, with negative straight leg raise, and normal strength, range of motion, sensation, coordination, and reflexes.

(Tr. at 1827.) Thus, the ALJ found that Dr. Shultz's opinions lack support and consistency with the record. As noted above, "an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician" where, like here, it is "apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." Dowling, 986 F.3d at 385. In the present case, the ALJ clearly acknowledged Dr. Shultz as Plaintiff's treating physician, with reference to his treatment records over the relevant period, but nevertheless made clear that the other factors set out in 20 C.F.R. § 404.1527(c), even if completely favorable to Plaintiff, failed to override the opinion's lack of support and lack of consistency with the record. As such, Plaintiff identifies no basis for remand.

14

C. Migraines

Plaintiff next argues that, in assessing her RFC, the ALJ failed to include any RFC restrictions to account for the limiting effects of Plaintiff's frequent migraine headaches or, in the alternative, sufficiently explain the absence of such restrictions. Plaintiff contends that she presented ample evidence of her ongoing migraine symptoms during the time period at issue, including light sensitivity, intractable pain, and extended recovery times.

Notably, the ALJ included migraines among Plaintiff's severe impairments at step two of the sequential analysis, and then specifically explained that the RFC limitation to "light work with environmental, manipulative, and postural limitations, and a sit/stand option . . . also would prevent injury from potential migraine symptoms." (Tr. at 1827.) Thus, the RFC included restrictions to account for Plaintiff's migraine headaches. The ALJ further concluded that "the record as a whole—the medical evidence, the opinion evidence, and the claimant's testimony—supports a finding that the claimant retained the ability to perform work activity within the limitations described in the residual functional capacity assessment." (Tr. at 1827.) With respect to Plaintiff's allegation of additional limitations due to her symptoms, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 1824.)

Plaintiff asserts that the ALJ erred in finding Plaintiff's statements regarding the limiting effects of her headaches less than fully consistent with the medical evidence and other evidence of record. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and

15

supported by the evidence, and be clearly articulated so the individual and any subsequent

reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security

Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p,

2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529.    In Arakas,

983 F.3d 83, the Fourth Circuit clarified the procedure an ALJ must follow when assessing a

claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step
> framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029
> (Mar. 16, 2016). First, the ALJ must determine whether objective medical
> evidence presents a "medically determinable impairment" that could reasonably
> be expected to produce the claimant's alleged symptoms.    20 C.F.R.
> § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess
> the intensity and persistence of the alleged symptoms to determine how they
> affect the claimant's ability to work and whether the claimant is disabled. See 20
> C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4.    At this step,
> objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016
> WL 1119029, at *4–5.  SSR 16-3p recognizes that "[s]ymptoms cannot always
> be   measured   objectively   through   clinical   or   laboratory   diagnostic
> techniques." Id. at *4. Thus, the ALJ must consider the entire case record and
> may "not disregard an individual's statements about the intensity, persistence,
> and limiting effects of symptoms solely because the objective medical evidence
> does not substantiate" them. Id. at *5.

983 F.3d at 95.  Thus, the second part of the test requires the ALJ to consider all available

evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity

and persistence of the claimant's pain, and the extent to which it affects her ability to work."

Craig, 76 F.3d at 595.  This approach facilitates the ALJ's ultimate goal, which is to accurately

determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform

basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history,

16

medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors
set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529(c)(3):

(i)     [Plaintiff's] daily activities;
(ii)    The location, duration, frequency, and intensity of [plaintiff's] pain or
        other symptoms;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication
        [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
(v)     Treatment, other than medication, [Plaintiff] receive[s] or [has] received
        for relief of [her] pain or other symptoms;
(vi)    Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other
        symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes
        every hour, sleeping on a board, etc.); and
(vii)   Other factors concerning [Plaintiff's] functional limitations and
        restrictions due to pain or other symptoms.

In the present case, the ALJ provided more than conclusory statements discounting Plaintiff's
testimony. As instructed by the regulations, the ALJ considered the entire case record and
explained his reasons for deviating from Plaintiff's statements regarding the impact of her
migraine symptoms on her ability to work. This explanation was provided throughout the
ALJ's RFC discussion. During her 2020 hearing, Plaintiff testified that "she experienced
severe migraine headaches at least once a week, which required her to lie in a dark room for
much of the day." (Tr. at 1824, 51.) In addition, Plaintiff testified that "her migraines were
accompanied by nausea and vomiting." (Tr. at 1824, 51-52.) In contrast, at her most recent
hearing, Plaintiff testified that she experienced ocular—or optical—migraines during the time
period at issue, which she described as lasting approximately 30 minutes, during which she
experienced blind spots and flashing lights in her field of vision. (Tr. at 1879-80.)

The ALJ acknowledged that Plaintiff had a history of migraine headaches, "dating to
at least 2011." (Tr. at 1826, citing Tr. at 541, 677, 685, 855). However, the ALJ further noted

17

that MRI and CT imaging of Plaintiff's brain was "unremarkable." (Tr. at 1826, citing Tr. at 541, 805, 1184). Moreover, the ALJ noted as follows:

> Severe migraines with nausea/vomiting were treated with injections of Toradol and Phenergan, which resolved her symptoms. Otherwise, [Plaintiff] received little migraine-specific treatment. Nevertheless, severe migraines were reported only infrequently; [Plaintiff] referred to her migraines as stable, and she often denied headaches. Additionally, the record shows no observation of photophobia or phonophobia.

(Tr. at 1826) (internal citations omitted).

Plaintiff disputes the sufficiency of the ALJ's explanation. In particular, she argues that her brain imaging results had no bearing on the existence or severity of her migraines, but were instead intended to rule out non-migraine sources for her headaches. This is true, but is relevant to the ALJ's analysis for the same reason, to rule out other potential causes or impairments. Plaintiff further contends that many of the records cited by ALJ as indicating that Plaintiff denied headaches were in the context of treatment unrelated to migraines. This is also true, but nevertheless reflects the lack of headache at those times. Moreover, Plaintiff fails to successfully refute the ALJ's finding that, overall, Plaintiff "received little migraine-specific treatment." (Tr. at 1826.) As set out above, and emphasized in the Commissioner's brief, Plaintiff bears the burden of proving disability through step four of the sequential analysis. In the present case, Plaintiff argues that, "in addition to sometimes requiring pain injections, [she] generally took various pain medications to treat her migraine headaches, including Toradol, Tramadol, Diclofenac, and Topamax, [along with] other medication such as Metoprolol[] and Promethazine HCl for nausea" which "were prescribed by multiple different medical providers." (Pl.'s Reply Br. [Doc. #11] at 3-4) (citing Tr. at 539, 685, 688, 741, 743, 1014, 1117, and 1120). Plaintiff therefore contends that "the ALJ was simply wrong

18

in stating that [Plaintiff] otherwise received little migraine-specific treatment." (Pl.'s Reply Br. at 4.)

A review of the records cited by Plaintiff reveals no basis to disturb the ALJ's findings. Of the eight transcript pages highlighted by Plaintiff, five involve three treatment notes, all pre-dating Plaintiff's alleged disability period (Tr. at 539, 685, 688, 741, 743) (April 2011, December 2011, and April 2012, more than a year and a half before the December 2013 alleged onset date), and the other three (two of which are duplicates) involve a single instance in February 2015 in which Plaintiff admittedly failed to pick up her Tramadol prescription (Tr. at 1014, 1117, 1120). These records fail to undermine the ALJ's migraine findings as Plaintiff now suggests. In fact, this record provides ample support for the ALJ's conclusion that Plaintiff "received little migraine-specific treatment" during the relevant period. (Tr. at 1826.) As noted by the ALJ, she also described her migraines as "stable" during the relevant period. (Tr. at 1826, 1028.)

To the extent that Plaintiff further argues that the ALJ wrongly concluded that "the record shows no observation of photophobia or phonophobia" (Pl.'s Reply Br. at 4) (citing Tr. at 1826), she again provides no evidence to the contrary. In fact, she acknowledges that "[t]he records cited by the ALJ document that on two occasions, [Plaintiff] reported during a migraine or ocular migraine that she was not light sensitive." (Pl.'s Reply Br. at 5) (citing Tr. at 527, 1014, 1117). Plaintiff's argument appears to stem from a single note during migraine treatment in 2012 in which it was noted that she was lying in the exam room with the lights out. (Pl.'s Reply Br. at 5) (citing Tr. at 685). However, this record predates Plaintiff's alleged

19

onset date by more than 20 months and fails to unambiguously connect Plaintiff's behavior with photophobia.

Overall, the Court finds that substantial evidence supports the ALJ's findings regarding Plaintiff's migraine headaches. Whether the ALJ could have reached a different conclusion based on the evidence is irrelevant. The sole issue before the Court is whether substantial evidence supports the ALJ's decision. *See* Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972) ("[T]he language of § 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the Secretary's decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"). While Plaintiff disagrees with the ALJ's determination, it is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ provided sufficient analysis to allow the Court to follow his reasoning, and there is sufficient evidence to support the ALJ's determination. Accordingly, the Court finds no basis for remand.

D. Swearing of witnesses

Finally, Plaintiff contends that, during her most recent administrative hearing, the ALJ failed to properly administer an oath or affirmation to the Plaintiff or the vocational expert, both of whom testified. (Pl.'s Br. at 24-34.) The regulations instruct that all witnesses "will testify under oath or affirmation unless the administrative law judge finds an important reason to excuse them from taking an oath or affirmation." 20 C.F.R. § 404.950(e). The Hearings, Appeals, and Litigation Law Manual ("HALLEX") includes a nearly identical requirement, providing that, "[g]enerally, an administrative law judge (ALJ) will take all testimony provided at the hearing under oath or affirmation, unless the ALJ finds that there is an important reason not to." HALLEX § I-2-6-54(A).

In the present case, as Plaintiff correctly notes, the transcript of her October 19, 2023 telephonic hearing does not expressly include the administration of an oath or affirmation to either Plaintiff or the vocational expert. However, the certified transcript does include a statement, prior to the beginning of testimony by both witnesses, indicating that the oath or affirmation was first administered. In fact, at each of the administrative hearings in this case, the transcripts note that Plaintiff, "having been first duly sworn, testified as follows[,]" and that the vocational expert, "having been first duly sworn, testified as follows." (See Tr. at 48, 69, 84, 105, 116, 122, 1849, 1881, 1980, 2001, 2025, and 2046.) This is consistent with the Commissioner's explanation that "[b]y routine practice, the oath is not transcribed verbatim"; rather, the transcript only indicates that the witnesses received it. (Def.'s Br. [Doc. #10] at 19.) The Commissioner further explained that, "[t]hrough certification of the transcript and stating that all witnesses were administered the oath, the transcriber is certifying that the

administered oath was heard." (Def.'s Br. at 19.) Nothing in the regulations or agency guidance cited by Plaintiff requires more explicit evidence regarding swearing of witnesses, nor does Plaintiff point to any case law to this effect. Accordingly, Plaintiff's final argument provides no basis for remand.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #8] be DENIED, that Defendant's Dispositive Brief [Doc. #10] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 26th day of February, 2026.

Joi Elizabeth Peake
United States Magistrate Judge

22